J-S75035-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| BRIAN SCOTT HUGHES, | : | |
| | : | |
| Appellant | : | No. 741 WDA 2017 |

Appeal from the Judgment of Sentence April 25, 2017
in the Court of Common Pleas of Mercer County,
Criminal Division at No(s):  CP-43-CR-0001370-2016,
CP-43-CR-0001372-2016

BEFORE:  SHOGAN, J., OTT, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED FEBRUARY 27, 2018**

Brian Scott Hughes ("Hughes") appeals from the judgment of sentence imposed following his convictions of two counts of possession of drug paraphernalia, and one count each of possession with intent to manufacture a controlled substance, possession of a controlled substance, possession of ephedrine, liquefied ammonia gas; precursors and chemicals, operating a methamphetamine laboratory, risking catastrophe, and recklessly endangering another person.[1]  We affirm.

The suppression court set forth the relevant factual and procedural history in its Order denying Hughes's Motion to suppress, which we adopt for the purpose of this appeal.  **See** Trial Court Order, 1/25/17, at 1-6.

_____

[1] **See** 35 P.S. §§ 780-113(a)(32), 780-113(a)(30), 780-113(a)(16), 780-113(a)(39), 780-113.1, 780-113.4(a)(1); 18 Pa.C.S.A. §§ 3302(b), 2705.

On December 30, 2016, Hughes filed a *nunc pro tunc* Motion to suppress evidence recovered from his hotel room after the initial search by Agent Gary Double ("Agent Double") of the Board of Probation and Parole, and the second search by the Hermitage Police Department. The suppression court conducted a hearing, and subsequently denied Hughes's Motion to suppress.

Following a jury trial, Hughes was convicted of the above-mentioned crimes. The trial court deferred sentencing and ordered a pre-sentence investigation report ("PSI"). Subsequently, the trial court sentenced Hughes to an aggregate term of 2½ to 10 years in prison, with credit for time served. Hughes filed a Motion to Modify Sentence. The trial court denied Hughes's Motion to Modify Sentence. Hughes filed a timely Notice of Appeal and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

On appeal, Hughes raises the following questions for our review:

1. Whether the suppression court erred when it admitted evidence found from a search done by [Agent Double] that led to additional evidence found in a search done by the Hermitage Police Department[?]

2. Whether the trial court erred when it denied Hughes'[s] Motion for judgment of acquittal when the Commonwealth clearly failed to produce sufficient evidence to prove the element of possession in regard to the charge of operating a methamphetamine laboratory and related charges thereof[?]

3. Whether the trial court erred when it issued a clearly unreasonable sentence to Hughes for operating a methamphetamine laboratory[,] resulting in a 1½ year to 8 year

state penitentiary sentence[,] and for risking a catastrophe[,] resulting in a 1 year to 2 year concurrent[2] state penitentiary sentence in violation of a fundamental norm where a sentence of confinement should address a defendant's rehabilitative needs[?]

Brief for Appellant at 9-10 (issues numbered; some capitalization omitted; footnote added).

In his first claim, Hughes argues that the suppression court erred by allowing the admission of evidence obtained during the search by Agent Double, and the second search by police. *Id.* at 23. Regarding the search by Agent Double, Hughes claims that because Agent Double arrived at the hotel to determine whether Hughes had violated his parole by moving without first obtaining permission, "[t]he possible parole violation was moot upon confirming that Hughes[] was still at his approved residence[.]" *Id.* at 25. Hughes contends that the subsequent weapons pat-down search performed by Agent Double "was nothing more than a ploy to find a violation[,] and not reasonabl[y] related to the initial suspected violation." *Id.* at 26.

Regarding the subsequent police search of the hotel room, Hughes argues that he had a reasonable expectation of privacy in his concealed personal effects (*i.e.*, the duffle bag and plastic water bottle found under the

---

[2] We note that Hughes incorrectly states throughout his brief that he received concurrent sentences for his operating a methamphetamine laboratory and risking catastrophe convictions. In fact, the trial court imposed consecutive sentences for these convictions. *See* Sentencing Order, 4/25/17, at 1-2.

box spring). *Id.* at 27. Hughes contends that the discovery of the illegal items by the police was the result of the hotel staff's search, and that "[t]he hotel staff had no justification to examine the contents of the bag found in the room." *Id.* at 28.

> In reviewing the denial of a motion to suppress, our responsibility is to determine whether the record supports the suppression court's factual findings and legitimacy of the inferences and legal conclusions drawn from those findings. If the suppression court held for the prosecution, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the factual findings of the suppression court are supported by the evidence, the appellate court may reverse if there is an error in the legal conclusions drawn from those factual findings.

*Commonwealth v. Arnold*, 932 A.2d 143, 145 (Pa. Super. 2007) (citation omitted).

The suppression court previously considered both of Hughes's arguments in its Order denying Hughes's Motion to suppress. *See* Trial Court Order, 1/25/17, at 6-14. Regarding the search by Agent Double, the suppression court set forth the relevant law concerning searches of a parolee's person and property, addressed Hughes's argument, and concluded that the search was supported by reasonable suspicion that Hughes possessed contraband or other evidence of violations of the conditions of his supervision. *See id.* at 6-11. Regarding the police search, the suppression court set forth the relevant law, addressed Hughes's argument, and concluded that any privacy interest Hughes may have had in

his personal effects, after he had checked out, was outweighed by the exigent circumstances created by the "notoriously dangerous process" of clandestine methamphetamine production. ***See id.*** at 11-14. We agree with the suppression court's determinations, which are supported by the record and free of legal error, and affirm on this basis as to Hughes's first issue. ***See id.*** at 6-14.

In his second claim, Hughes contends that there was insufficient evidence to support his convictions of possession with intent to deliver[3] a controlled substance and operating a methamphetamine laboratory because the Commonwealth did not establish the element of possession. Brief for Appellant at 29. Hughes argues that "[t]here was no evidence produced to show that Hughes was the owner of the bag, that he knew the bag was present under his bed and that he was an active participant in the making of methamphetamines." ***Id.*** at 32. Hughes additionally claims that there was no testimony regarding when the methamphetamine laboratory would have been active. ***Id.*** Hughes claims that "the Commonwealth's evidence was so weak as to the issue of possession that the [t]rial [c]ourt should have granted Hughes['s] Motion for Judgment of Acquittal on a majority of the charges where possession was a key element." ***Id.***

---

[3] We observe that Hughes's conviction under 35 P.S. § 780-113(a)(30) was for possession with intent to **manufacture** a controlled substance.

> The standard we apply in reviewing the sufficiency of the evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Furness**, 153 A.3d 397, 401 (Pa. Super. 2016) (citation and brackets omitted).

Section 780-113(a)(30) of The Controlled Substance, Drug, Device and Cosmetic Act ("the Act") prohibits the following acts:

> [T]he manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

35 P.S. § 780-113(a)(30). The Act defines "manufacture" as "the production, preparation, propagation, compounding, conversion or processing of a controlled substance...." **Id.** § 780-102.

- 6 -

The Act defines the offense of operating a methamphetamine laboratory as follows:

> A person commits the offense of operating a methamphetamine laboratory if the person knowingly causes a chemical reaction involving ephedrine, pseudoephedrine or phenylpropanolamine, or any other precursor or reagent substance under section 13.1,[FN] for the purpose of manufacturing methamphetamine or preparing a precursor or reagent substance for the manufacture of methamphetamine.
>
> [FN]: 35 P.S. § 780-113.1.

*Id.* § 780-113.4(a)(1). Section 780-113.1 prohibits the possession of the above-mentioned substances with the intent to unlawfully manufacture a controlled substance.[4] *See id.* § 780-113.1.

Hughes challenges the sufficiency of the evidence only as it relates to his possession of the duffle bag found under the bed. Where, as here, "the contraband is not discovered on the defendant's person, the Commonwealth may satisfy its evidentiary burden by proving that the defendant had constructive possession of the drug." *Commonwealth v. Vargas*, 108 A.3d 858, 868 (Pa. Super. 2014).

> Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as "conscious dominion." We subsequently defined "conscious dominion" as "the power to control the contraband and the intent to exercise

---

4 Hughes does not specifically challenge his conviction under 35 P.S. § 780-113.1.

- 7 -

that control." To aid application, we have held that constructive possession may be established by the totality of the circumstances.

***Commonwealth v. Roberts***, 133 A.3d 759, 767-68 (Pa. Super. 2016) (citation omitted); ***see also Vargas***, 108 A.3d at 868 (stating that "circumstantial evidence may be used to establish a defendant's possession of drugs or contraband." (citation omitted)).

Here, Roberta Betts ("Betts"), an assistant housekeeper at the Quality Inn, testified that she entered Hughes's room on July 7, 2016, after he had checked out, to perform a "deep clean." ***See*** N.T., 2/15/17, at 24. Betts stated that she removed all of the bedding, including the bed skirt, from the room's only bed. ***See id.*** at 25. Betts testified that when she adjusted the box spring, she noticed a jar containing clear liquid and brown pellets under the left box spring. ***See id.*** Betts also noticed a duffel bag containing a black bowl, brown pellets in a plastic bag, something that "looked like Drano," and a bag containing white powder. ***See id.*** at 25, 31; ***see also id.*** at 30-31 (wherein Betts testified that the top of the duffle bag was open when she found it, and the bag's contents were in plain view). Betts called the front desk to report what she had found, and was instructed to leave the room. ***See id.*** at 31-32. Betts testified that, to her knowledge, no other staff members entered Hughes's room before the police arrived. ***See id.*** at 32-33.

Deborah Donella ("Donella"), the general manager of the Quality Inn, testified that Hughes had checked into the Quality Inn on June 5, 2016. ***See***

*id.* at 49. Donella stated that Hughes was the only individual identified on the room lease, and he had paid for the room through July 11, 2016. **See id.** at 43, 45. Donella testified that Hughes had checked out at 11:22 a.m. on July 7, 2016. **See id.** at 43. Additionally, Donella testified that she did not enter Hughes's room after he had checked out, until she entered with police officers. **See id.** at 45.

Corporal Dennis Ulery ("Corporal Ulery"), the coordinator for the Pennsylvania State Police Clandestine Laboratory Response Team ("CLRT"), testified that the most common method of making methamphetamine is known as the "one-pot" or "shake-and-bake" method, which involves the use of a plastic bottle. **See id.** at 67-68. Corporal Ulery stated that on July 7, 2016, he was dispatched to the Quality Inn in Hermitage with the CLRT and met with members of the Hermitage Police Department, who informed him that there was a suspected meth lab in a room on the second floor. **See id.** at 71-72. Corporal Ulery testified that, in his opinion, the items recovered from Hughes's hotel room (*i.e.*, lithium batteries, pliers, solvent, ammonium nitrate, which was removed from the cold pack package and placed in a plastic bag, drain cleaner, and a bottle) evidenced a clandestine methamphetamine laboratory. **See id.** at 78-80; **see also id.** at 79 (wherein Corporal Ulery stated that "[t]hese items [] really have no reason to be together unless they are going to be used for a meth cook.").

In its Rule 1925(a) Opinion, the trial court considered Hughes's claim, and concluded that, "[g]iven the length of time [Hughes] was in the room,

given that he was the sole person named on the lease, and given [that] he was the only one in the room the day the contraband was found," there was "ample circumstantial evidence to conclude beyond a reasonable doubt that [Hughes] possessed the contraband." Rule 1925(a) Opinion, 6/6/17, at 6. Upon review, we agree that the totality of the circumstances supports the finding that Hughes was in constructive possession of the contraband found in his hotel rom. Accordingly, Hughes is not entitled to relief on his second claim.

In his third claim, Hughes asserts that his sentence is "clearly unreasonable and against the fundamental norms of sentencing." Brief for Appellant at 33. Hughes claims that he should have received a mitigated sentence because his "actual possession of the materials found in the hotel room was highly speculative[.]" *Id.* at 36.

Hughes's claim challenges the discretionary aspects of his sentence, from which there is no automatic right to appeal. *See Commonwealth v. Mastromarino*, 2 A.3d 581, 585 (Pa. Super. 2010). Prior to reaching the merits of a discretionary sentencing issue,

> [this Court conducts] a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010) (quotation marks and some citations omitted).

Here, Hughes filed a timely Notice of Appeal, as well as a post-sentence Motion to Modify Sentence. Hughes also included a separate Rule 2119(f) Statement in his brief. Accordingly, we will review Hughes's Rule 2119(f) Statement to determine whether he has raised a substantial question.

> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process.

*Moury*, 992 A.2d at 170. Our inquiry "must focus on the reasons for which the appeal is sought, in contrast to the facts underlying the appeal, which are necessary only to decide the appeal on the merits." *Commonwealth v. Tirado*, 870 A.2d 362, 365 (Pa. Super. 2005) (citation omitted). Additionally, this Court "cannot look beyond the statement of questions presented and the prefatory 2119(f) statement to determine whether a substantial question exists." *Commonwealth v. Provenzano*, 50 A.3d 148, 154 (Pa. Super. 2012).

In his Rule 2119(f) Statement, Hughes concedes that he received a standard-range sentence for both convictions. Brief for Appellant at 21-22.

However, Hughes cites to Section 9781(c)(2) of the Sentencing Code,[5] and again argues that his "knowledge and actual possession of the materials found in the hotel room was highly speculative at the close of the Commonwealth's case." *Id.* at 22.

While Hughes cites Section 9781(c)(2), he has failed to explain why he believes his standard-range sentence is unreasonable in light of the circumstances of this case. *See Commonwealth v. Goggins*, 748 A.2d 721, 727 (Pa. Super. 2000) (*en banc*) (stating that "where a defendant merely asserts that his sentence is inconsistent with the Sentencing Code or contrary to the fundamental norms underlying the sentencing scheme without explaining how or why, we cannot determine whether he has raised a substantial question."); *id.* (explaining that in addition to specifying "where the sentence falls in relation to the sentencing guidelines and what particular provision of the Code is violated," an appellant's "Rule 2119(f)

_____

[5] Section 9781 provides, in relevant part, as follows:

> **(c) Determination on appeal.--**The appellate court shall vacate the sentence and remand the case to the sentencing court with instructions if it finds:
>
> * * *
>
> (2) the sentencing court sentenced within the sentencing guidelines but the case involves circumstances where the application of the guidelines would be clearly unreasonable[.]

42 Pa.C.S.A. § 9781(c)(2).

statement must specify what fundamental norm the sentence violates and the manner in which it violates that norm"). Instead, Hughes appears to rely on his challenge to the sufficiency of the evidence. We conclude that Hughes has not raised a substantial question that his standard-range sentence is inappropriate or contrary to a fundamental norm underlying the Sentencing Code, and we will not address the merits of his final claim.[6]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/27/2018

---

[6] Moreover, where, as here, the trial court had the benefit of a PSI, this Court will presume that the trial court was aware of, and considered all relevant factors, and "[h]aving been fully informed by the [PSI], the sentencing court's discretion should not be disturbed." **Commonwealth v. Devers**, 546 A.2d 12, 18 (Pa. 1988). Additionally, during the sentencing hearing, the trial courted noted the seriousness of Hughes's crimes, and "the life-threatening qualities of the gases which are produced during making meth…." N.T., 4/25/17, at 16.

**IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

01:26:17
2·DA
1·PD

COMMONWEALTH OF
PENNSYLVANIA

v.

BRIAN SCOTT HUGHES,
Defendant

No.   1370 CR 2016
      1372 CR 2016

2017 JAN 25  PM 2:48
KATHLEEN M. KLOOS
CLERK AND REGISTER
FILED IN MERCER COUNTY

## ORDER

AND NOW, this 25 day of January, 2017, before the Court is Defendant Brian Scott

Hughes' ("Defendant's") December 30, 2016 motion to suppress evidence of two searches

stemming from the same incident on July 7, 2016.  For the foregoing reasons, the Court

DENIES the motion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY:

The Court took testimony on January 4, 2017, and made the following factual findings

relevant to the present disposition:

In mid-June of 2016, Agent Gary Double of the Pennsylvania Board of Probation and

Parole was supervising the Defendant, who was staying at the Quality Inn in Hermitage,

Pennsylvania.  Based upon a series of phone calls with the Defendant, Agent Double knew

that the Defendant had the intention of relocating to the New Castle City Mission in New

Castle, Pennsylvania, but did not give Agent Double a specific date.  Agent Double told the

Defendant that the Defendant needed to inform Agent Double if the Defendant actually

decided to change his residence.  By July 7, 2016 Agent Double had not heard from the

1

SCANNED

Defendant for a week, so Agent Double visited the Quality Inn in Hermitage to check in on the Defendant. Agent Double went to the Defendant's room and the Defendant invited Agent Double to enter. As soon as Agent Double started to interact with the Defendant, Agent Double noticed a change in the Defendant's demeanor and behavior from Agent Double's previous interactions with the Defendant. Before that date, Agent Double testified that the Defendant had a positive attitude and was open with Agent Double. But on this occasion, the Defendant was sullen, depressed, would not look Agent Double in the eye, and only provided cursory and brief answers to Agent Double's questions.

Agent Double asked the Defendant to sit down on the bed, and noticed a beer can on a table in the room. Agent Double asked the Defendant if he had been drinking, which the Defendant denied at first, but eventually admitted to having a couple of beers. The consumption of alcohol was contrary to Defendant's parole/probation conditions. Agent Double asked the Defendant to retrieve his parole/probation paperwork, and the Defendant began to search in a black backpack on a nearby table, but was unable to find the paperwork. When Agent Double asked the Defendant to retrieve his parole/probation paperwork, Agent Double again noticed that the Defendant was not actively cooperating, continued to give one-word answers, and was acting very differently from how the Defendant had previously acted around Agent Double.

Based upon this significant change in demeanor, Agent Double testified that he was concerned for his safety and decided to perform a weapons pat-down of the Defendant's person. At first, the Defendant did not comply with Agent Double's request to place his hands behind his head, but eventually did so after another request from Agent Double. The Agent first patted-down the Defendant at his waistband, then reached into the Defendant's

2

pants pocket. When Agent Double reached into the Defendant's pants pocket, he found a syringe and a glass pipe typically used for smoking marijuana, with what appeared to be marijuana residue on the inside. Agent Double also found baggies and pieces of paper on the Defendant, with what he believed to be heroin residue on the inside.

At that point, Agent Double placed the Defendant under arrest, put handcuffs around his wrists, and called for backup from the Board of Probation and Parole and the Hermitage Police Department. After handcuffing the Defendant, Agent Double searched the black book bag and found a large plastic bag with a smaller plastic bag inside of it, which contained what Agent Double believed to be marijuana seeds. Hermitage Police Officer Samuel Staples arrived at the scene around 10:30 am and indicated that the Hermitage Police would be charging the Defendant and Agent Double took the Defendant to the Mercer County Jail. The suspected heroin residue was field-tested and came back positive for methamphetamine.

Later that day, Hermitage Police Officer James Brown was dispatched to the Quality Inn in Hermitage to speak to management about suspected drugs that had been found in a bag in the Defendant's room. The Defendant's period of occupancy expired between the time Agent Double transported the Defendant to the Mercer County Jail and when Officer Brown Arrived. Officer Brown testified that he had previously worked for the Mercer County Drug Task Force where he had been trained on how to identify the presence of clandestine methamphetamine production, and the common materials and chemicals associated with the processes such as household cleaners, plastic bottles, tubes, emptied cold packs, batteries, and tools to create such an operation. The hotel staff told Officer Brown that only the housekeeper had been in the Defendant's room since the Defendant had left, and the housekeeper found a suspicious bag and bottle. Management let Officer Brown into the

3

room and showed him that under the box spring of the mattress was a silver duffel bag and a plastic water bottle containing a cloudy pink substance. Officer Brown testified that as soon as he came into the room, he smelled what he described as a chemical smell which resembled nail polish remover or ether.

Prior to this incident, Officer Brown had worked for the Mercer County Drug Task Force where he had been made aware of "one-pot meth labs" (or clandestine methamphetamine production) and common signals that one may be near including smells and materials. Believing that this water-bottle was indeed being used to create methamphetamine, a very dangerous process with a high risk of fire or explosion, he immediately contacted the Pennsylvania State Police Clandestine Laboratory Response Team ("CLRT"), the Hermitage Fire Department, and ordered everyone out of the room. At no point did he touch any of the materials due to the dangerous nature of the chemicals.

The CLRT team arrived at approximately 5:30 pm and spoke with Officer Brown about what he had seen and smelled. The CLRT team determined that the water bottle was being used for the production of methamphetamine, and safely cleared the threat. At that point, Officer Brown looked into the bag and saw beads from a cold pack, other bottles with holes in the top of them, rubber hoses, batteries, and tools: all items associated with "one-pot meth labs". Commonwealth's Exhibit 1 is a photograph of the bag and some of its contents, and Officer Brown testified that the picture accurately depicted what he had observed.

At 1372 CR 2016, the Commonwealth submitted a police criminal complaint and affidavit of probable cause on July 11, 2016. On October 17, 2016, the Commonwealth submitted its criminal information, which charged defendant with Possession of a Controlled

4

Substance[1], and Possession of Drug Paraphernalia[2] stemming from the initial search by Agent Double and Officer Staples.

At 1370 CR 2016, the Commonwealth submitted a police criminal complaint and affidavit of probable cause on July 25, 2016. On October 17, 2016, the Commonwealth submitted its criminal information which charged the Defendant with Manufacture, Delivery, or Possession with intent to Manufacture or Deliver a Controlled Substance[3], Liquefied Ammonia Gas: Precursors and Chemicals[4], Operating a Methamphetamine Laboratory and Illegal Dumping of Methamphetamine Waste[5], Risking Catastrophe[6], Recklessly Endangering Another Person[7], Possession of a Controlled Substance[8], Possession of Drug Paraphernalia[9], and Knowingly Possessing Ephedrine[10]. These charges stemmed from the recovery of the clandestine methamphetamine laboratory after Defendant's initial arrest.

On November 28, 2016 the Defendant entered a plea of no contest at 1370 CR 2016 to Operating a Methamphetamine Laboratory and Illegal Dumping of Methamphetamine Waste (35 Pa.C.S. § 780-113.4(a)(1)) and Recklessly Endangering another Person (18 Pa.C.S. § 2705) and the Commonwealth *nol prossed* the balances of the charges at both docket numbers pursuant to the plea agreement. On December 8, 2016 after receiving a

---

[1] 35 Pa.C.S. § 780-113(a)(16).
[2] 35 Pa.C.S. § 780-113(a)(32).
[3] 35 Pa.C.S. § 780-113(a)(30).
[4] 35 Pa.C.S. § 780-113.1(a)(3).
[5] 35 Pa.C.S. § 780-113.4(a)(1).
[6] 18 Pa.C.S. § 3302(b).
[7] 18 Pa.C.S. § 2705.
[8] 35 Pa.C.S. § 780-113(a)(16).
[9] 35 P.S. § 780-113(a)(32).
[10] 35 Pa.C.S. § 780-113(a)(39).

5

request from the Defendant to withdraw his guilty plea, the Court entered an order withdrawing the plea and reinstating the charges at both pleas and docket numbers.

On December 30, 2016, the Defendant submitted a *nunc pro tunc* motion to suppress evidence which is now before this Court. In his motion to suppress, and at the evidentiary hearing held on January 4, 2017, the Defendant argued that the search of his hotel room was unconstitutional because the agents did not have reasonable suspicion to conduct the search of the hotel room. Regarding the second search, the Defendant argues that it was the fruit of an illegal search, and/or the search was performed without a warrant.

To address the Defendant's first suppression issue, the court quotes at length from a recent Superior Court decision, ***Commonwealth v. Parker***, --A.3d-- (Pa. Super 2016), 340 MDA 2016 (December 12, 2016), which clearly delineates the relevant rules and procedures for the search of a probationer's/parolee's residence:

> The aim of probation and parole is to rehabilitate and reintegrate a lawbreaker into society as a law-abiding citizen. ***Commonwealth v. Chambers***, 55 A.3d 1208, 1212 (Pa. Super. 2012). The institution of probation and parole assumes a probationer or parolee is more likely than the ordinary citizen to violate the law. ***Commonwealth v. Moore***, 805 A.2d 616, 619 (Pa. Super. 2002). Consequently, probationers and parolees have limited Fourth Amendment rights because of a diminished expectation of privacy. *Id. See also **Chambers, supra*** (stating probationers' and parolees' Fourth Amendment constitutional rights are virtually indistinguishable). This Court explained that probation officers, like parole officers:
>
> > [A]re in a supervisory relationship with their offenders. The purpose of this supervision is to assist the offenders in their rehabilitation and reassimilation into the community and to protect the public. Supervision practices shall reflect the balance of enforcement of the conditions of parole and case management techniques to maximize successful parole completion through effective reentry to society. As such, probationers and parolees are subject to general and individual rules of conduct and supervision described at sentencing and/or in the parole agreement.

6

*Commonwealth v. Smith*, 85 A.3d 530, 536 (Pa. Super. 2014) (internal citations and quotation marks omitted).

The statute governing the supervisory relationship between probation officers and probationers and the concomitant rights of the probationers, in effect at the time of the search in this case, provided in relevant part:

### § 9912. Supervisory relationship to offenders

**(a) General rule.**—Officers are in a supervisory relationship with their offenders. The purpose of this supervision is to assist the offenders in their rehabilitation and reassimilation into the community and to protect the public.

**(b) Searches and seizures authorized.**—

(1) Officers and, where they are responsible for the supervision of county offenders, State parole agents may search the person and property of offenders in accordance with the provisions of this section.

\* \* \*

**(c) Effect of violation.**—No violation of this section shall constitute an independent ground for suppression of evidence in any probation and parole or criminal proceeding.

**(d) Grounds for personal search.**—

(1) A personal search of an offender may be conducted by an officer:

(i) if there is a reasonable suspicion to believe that the offender possesses contraband or other evidence of violations of the conditions of supervision;

(ii) when an offender is transported or taken into custody; or

(iii) upon an offender entering or leaving the securing enclosure of a correctional institution, jail or detention facility.

(2) A property search may be conducted by an officer if there is reasonable suspicion to believe that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision. [Emphasis removed from *Parker*].

7

(3) Prior approval of a supervisor shall be obtained for a property search absent exigent circumstances. No prior approval shall be required for a personal search.

(4) A written report of every property search conducted without prior approval shall be prepared by the officer who conducted the search and filed in the offender's case record. The exigent circumstances shall be stated in the report.

(5) The offender may be detained if he is present during a property search. If the offender is not present during a property search, the officer in charge of the search shall make a reasonable effort to provide the offender with notice of the search, including a list of the items seized, after the search is completed.

(6) The existence of reasonable suspicion to search shall be determined in accordance with constitutional search and seizure provisions as applied by judicial decision. In accordance with such case law, the following factors, where applicable, may be taken into account:

(i) The observations of officers.

(ii) Information provided by others.

(iii) The activities of the offender.

(iv) Information provided by the offender.

(v) The experience of the officers with the offender.

(vi) The experience of officers in similar circumstances.

(vii) The prior criminal and supervisory history of the offender.

(viii) The need to verify compliance with the conditions of supervision.

\* \* \*

42 Pa.C.S.A. § 9912(a), (b)(1), (c), (d) (effective October 13, 2009 to September 18, 2016) (emphasis added).

> [Footnote 5: The legislature amended this statute on July 20, 2016, effective in 60 days. The current version of the statute contains substantially similar language. See 42 Pa.C.S.A. § 9912 (amended July 20, 2016; effective September 19, 2016).]

See also 42 Pa.C.S.A. § 9913 (explaining probation officer is declared to be peace officer and shall have police powers and authority to arrest, with or without warrant, writ, rule or process, any person on probation under supervision of court for failing to report as required by terms of that person's probation, or for any other violation of that person's probation).

"The policy behind [Section 9912] is to assist the offenders in their rehabilitation and reassimilation into the community and **to protect the public**." *Moore, supra* at 620, (emphasis in original). "Essentially, Section 9912 authorizes county probation officers to search a probationer's person or property, if there is reasonable suspicion to believe the probationer possesses contraband or other evidence of violations of the conditions of supervision." *Chambers, supra* at 1214, (citing 42 Pa.C.S.A. § 9912(d)(1)(i), (d)(2)). "Reasonable suspicion to search must be determined consistent with constitutional search and seizure provisions as applied by judicial decisions; and in accordance with such case law, enumerated factors, where applicable, may be taken into account." *Chambers, supra* (citing 42 Pa.C.S.A. § 9912(d)(6)).

> In establishing reasonable suspicion, the fundamental inquiry is an objective one, namely, whether the facts available to the officer at the moment of the intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate. This assessment, like that applicable to the determination of probable cause, requires an evaluation of the totality of the circumstances, with a lesser showing needed to demonstrate reasonable suspicion in terms of both quantity or content and reliability.

*Moore, supra* at 619–20, (internal citations and quotation marks omitted).

"[T]he threshold question in cases such as this is whether the probation officer had a reasonable suspicion of criminal activity or a violation of probation prior to the . . . search." *In re J.E.*, 907 A.2d 1114, 1119 (Pa. Super. 2006), aff'd, 594 Pa. 528, 937 A.2d 421 (2007) (emphasis omitted). Accordingly, the fact that a probationer signs a consent form permitting warrantless searches as a term of his probation is insufficient to permit a search absent reasonable suspicion of wrongdoing. *Id.* at 1120. Rather, the probationer's signature acts as acknowledgment that the probation officer

9

"has a right to conduct reasonable searches of [the probationer's] residence listed on the [probation] agreement without a warrant." *Commonwealth v. E. Williams*, 547 Pa. 577, 588, 692 A.2d 1031, 1036 (1997).

*Commonwealth v. Parker*, --A.3d-- (Pa. Super 2016), 340 MDA 2016 (December 12, 2016) at 5-7.

Turning to the present case, it is clear that Agent Double had reasonable suspicion to search the Defendant's person and premises, and did not violate the Defendant's Fourth Amendment rights. In accord with Section 9912 and the aforementioned case law, Agent Double went to the Defendant's room when he believed that the Defendant may have violated his parole/probation by moving to a new location without permission. When he arrived at the property, Agent Double was invited into the Defendant's room and immediately saw a beer can, i.e., a technical parole/probation violation, in plain sight. After viewing this parole violation, and after noticing that the Defendant's demeanor had significantly changed since his last interaction with the Defendant, Agent Double became concerned for his safety, and decided to perform a pat-down search of the Defendant.

The Court finds that the pat-down search of the Defendant complied with the Constitutional requirements of *Terry v. Ohio*, 392 U.S. 1 (1968) and subsequent Pennsylvania case law on the matter, as Agent Double was reasonably concerned about his safety, believed that criminal activity was afoot, and that the Defendant could be in possession of a weapon. ("Police officers may conduct a limited pat-down search for weapons if they reasonably believe that criminal activity is afoot and that the individual is armed and dangerous" *Commonwealth v. Yong*, 120 A.3d 299, 303 fn. 1 (Pa. Super. 2015), reargument denied (Sept. 23, 2015), appeal granted on other grounds, 137 A.3d 573 (Pa. 2016), citing *Terry*. The search is also permissible based upon Section 9912(d) which

10

provides that to conduct a search of the Defendant's person, Agent Double only needed reasonable suspicion that the Defendant may possess contraband or other evidence of violations of the supervision conditions. The Court found Agent Double wholly credible and his observations of the Defendant, his previous interactions with the Defendant, and the presence of a technical parole violation are certainly enough to find reasonable suspicion of a parole violation and justify the search of the Defendant's person. After Agent Double found the presumed marijuana pipe and drug residue, he placed the Defendant under arrest and called for backup from the Board of Probation and Parole and the Hermitage Police Department.

At this point, Agent Double searched the bag the Defendant had reached into to look for his parole/probation paperwork, as Defendant had gone through the bag before Agent Double arrested him, and the room was small enough where the bag was still accessible to the Defendant. The Court finds that this search of the black backpack is valid under the well-established search incident to arrest exception to the warrantless search prohibition. See *Commonwealth v. Simonson*, 148 A.3d 792 (Pa. Super. 2016).

The second issue in the motion to suppress is whether or not the subsequent search of the hotel room violated the Defendant's Fourth Amendment rights. Our Superior Court has made the following observations on this topic:

> The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; Pa. Const. art. 1, § 8. "The protection of the Fourth Amendment does not depend on a property right in the invaded place but does depend on whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Commonwealth v. Brundidge*, 620 A.2d 1115, 1118 (Pa. 1993) (citing *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978)).

11

> An expectation of privacy is present when the individual, by his conduct, exhibits an actual (subjective) expectation of privacy and that the subjective expectation is one that society is prepared to recognize as reasonable. The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances. Additionally, a determination of whether an expectation of privacy is legitimate or reasonable entails a balancing of interests.

*Brundidge*, 620 A.2d at 1118 (internal citations and quotation marks omitted). Also, the Supreme Court has stated that "a guest in a motel or hotel room has a legitimate expectation of privacy during the period of time it is rented." *Id.*

As a general rule, "a search warrant is required before police may conduct any search." *Commonwealth v. White*, 669 A.2d 896, 900 (Pa. 1995). Absent the application of one of a few clearly delineated exceptions, a warrantless search or seizure is presumptively unreasonable. *Commonwealth v. McCree*, 924 A.2d 621, 627 (Pa. 2007). This is the law under both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. *Id.*

One such exception to our well-established warrant requirement is "exigent circumstances," which this Court has explained, as follows:

> The exigent circumstances exception to the warrant requirement recognizes that some situations present a compelling need for instant arrest, and that delay to seek a warrant will endanger life, limb[,] or overriding law enforcement interests. In these cases, our strong preference for use of a warrant must give way to an urgent need for immediate action.
>
> * * *
>
> Other factors may also be taken into account, such as whether there is hot pursuit of a fleeing felon, a likelihood that evidence will be destroyed if police take the time to obtain a warrant, **or a danger to police or other persons inside or outside the dwelling**.

*Commonwealth v. Richter*, 791 A.2d 1181, 1184–1185 (Pa.Super.2002) [Emphasis in *Caple*]. "An inquiry to determine whether exigent circumstances exist involves a balancing of the individual's right to be free from unreasonable intrusions against the interest of society in investigating crime quickly and adequately." *Commonwealth v. Hinkson*, 461 A.2d 616,

12

618 (Pa. Super. 1983). "It requires an examination of all of the surrounding circumstances in a particular case." *Id.* (citing *Commonwealth v. Harris*, 239 A.2d 290, 292 (Pa.1968)).

*Commonwealth v. Caple*, 121 A.3d 511, 517-518 (Pa. Super. 2015).

In the present matter, exigent circumstances dictated that Officer Brown was permitted to enter the hotel room of the Defendant, and that the CLRT team was permitted to search his belongings. As *Caple* and *Brundidge* state, the Defendant had an expectation of privacy in the hotel room while it was presently rented out. However, it is clear to the Court that after his period of paid occupancy expired, the Defendant no longer had the same privacy interests in that space, and the hotel staff were permitted to enter into the room without prior notice. The Hermitage Police, by extension, had the ability to enter into the room when so permitted by the hotel staff. The Defendant also raises the objection that, although the motel staff must have access to the room after time expired, this did not necessarily extend to personal items left behind by the Defendant. While Defendant is correct that personal possessions that do not readily reveal their contents are afforded a higher privacy interest, ("While the motel personnel must have access to and use of the motel room after the rental period expires, this does not extend to items of personal luggage or other containers which do not reveal the nature of their contents." *Brundidge*, 620 A.2d at 1119,) this interest is clearly overridden by the exigent circumstances presented by the clandestine methamphetamine laboratory.

When Officer Brown entered the room, he immediately smelled a strong odor of chemicals. Furthermore, when the staff alerted him to the bag in question, he found a plastic water bottle next to it with a cloudy pink substance inside. Based upon this information and his previous training and experience, Officer Brown suspected that this was a clandestine

13

methamphetamine laboratory. As a testament to the exigency of the circumstances, Officer Brown immediately ordered everyone out of the room and called the CLRT team to dispose of the suspected methamphetamine operation, without even examining the bag. Officer Brown also called the Hermitage Fire Department because he knew that there was a likelihood that the water bottle could cause a fire. The clandestine production of methamphetamine is a notoriously dangerous process, and the mixing of those chemicals may lead to explosions, small fires, and the subsequent serious harm to the officers and everyone else present in the hotel.

In summary, the Court denies Defendant's motion to suppress evidence of the searches. Agent Double was justified in performing a physical search of the Defendant, and upon his arrest was permitted to search his immediate surroundings pursuant to the search incident to arrest exception. Officer Brown did not need a warrant to search the hotel room after the Defendant's time for possession had passed, and although there is a higher standard for searching Defendant's personal possessions left behind, this was overridden by the presence of the highly dangerous methamphetamine operation.

**BY THE COURT,**

_____, J.
Robert G. Yeatts, Judge

14

**IN THE COURT OF COMMON PLEAS OF MERCER COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

COMMONWEALTH OF
PENNSYLVANIA

v.

No.   1370 CR 2016
1372 CR 2016

BRIAN SCOTT HUGHES,
   Defendant

FILED IN MERCER COUNTY
2017 JAN 25 PM 2: 48
KATHLEEN D. ...
CLERK AND REGISTER

## ORDER

AND NOW, this 25 day of January, 2017, Defendant's motion to suppress evidence obtained from the searches of his person, possessions, and hotel room conducted on July 7, 2016 is hereby denied.

**BY THE COURT,**

_____, J.
Robert G. Yeatts, Judge

15