**COMMONWEALTH of Pennsylvania,
Appellant**

v.

**Laquinn Anthony CHAMBERS,
Appellee.**

**No. 895 MDA 2011.**

Superior Court of Pennsylvania.

Argued Jan. 31, 2012.
Filed Sept. 21, 2012.

Christopher J. Schmidt, Assistant District Attorney, Harrisburg, Commonwealth, appellant.

Andrea L. Haynes, Harrisburg, for appellee.

BEFORE: GANTMAN, J., ALLEN, J., and MUNDY, J.

OPINION BY GANTMAN, J.:

Appellant, the Commonwealth of Pennsylvania, appeals from the order entered in the Dauphin County Court of Common Pleas, which granted the motion of Appellee, Laquinn Anthony Chambers, to suppress evidence obtained as the result of a stop, seizure, and arrest for multiple drug offenses. For the following reasons, we hold the probation officers lacked the requisite reasonable suspicion to seize Appellee under the facts and circumstances of this case. Therefore, the court properly granted Appellee's suppression motion. Accordingly, we affirm.

The relevant facts and procedural history of this case are as follows. On or about 8:00 P.M. on October 19, 2010, three Dauphin County probation officers were driving in an unmarked, black sport utility vehicle near the 1900 block of Market Street in Harrisburg, Pennsylvania. By chance, Appellee walked alone past their vehicle, in the opposite direction. Probation Officer Tim Kinsinger recognized Appellee as a former probationer whom he had previously supervised and mentioned this fact to Officer Lawrence Muza. Officer Muza stopped the vehicle. Officer Kinsinger believed Appellee was currently on probation and tried to exit from the back passenger seat of the vehicle to speak to Appellee. When Officer Kinsinger could not open the back door of the vehicle, Officer Muza exited it to question Appellee. None of the probation officers in the vehicle were supervising Appellee's current probation, and Officer Muza had not even met Appellee before this interaction.

By the time Officer Muza exited the vehicle, Appellee had already walked past it and was approximately at the rear fender. Officer Muza called out Appellee's name and identified himself as a probation officer. Appellee turned around and gave what Officer Muza described as a "deer in

headlights" look. Appellee shifted his feet and began backing away from Officer Muza. Officer Muza then shouted at Appellee, "Do not run." Appellee then turned as if to run. In response, Officer Muza drew his Taser, shouted "Taser, Taser" and deployed the device on Appellee. As soon as the officers gained control of Appellee, they conducted a search of Appellee's person and initially recovered nothing. In an alley near where the incident occurred, they found about $898.00 in cash. After taking Appellee into custody, the officers recovered from Appellee's mouth a Ziploc baggie containing a small amount of crack cocaine. The Commonwealth charged Appellee with possession with intent to deliver a controlled substance, tampering with physical evidence, and unlawful possession of drug paraphernalia.

On February 22, 2011, Appellee filed a motion to suppress all evidence obtained as a result of the two searches on the ground that the original seizure was unlawful and in violation of Appellee's constitutional rights, as it lacked the requisite reasonable suspicion. The court conducted a hearing on the matter on March 29, 2011. Defense counsel then argued, *inter alia*, that as soon as Officer Muza said, "Do not run," he restricted Appellee's movement, which was a seizure without reasonable suspicion. Counsel emphasized Officer Muza lacked reasonable suspicion to believe Appellee was in violation of his probation, and the command was constitutionally flawed. Officer Muza testified he had no personal experience with Appellee, did not know who Appellee's current probation supervisor was, had no idea if Appellee was in violation of his supervision, and made no calls to inquire. The defense concluded these factual circumstances did not support reasonable suspicion for the seizure. (*See* N.T. Suppression Hearing, 3/29/11, at 53–57.)

The Commonwealth took the position that random field contacts with probationers were acceptable under Pennsylvania law. Once Officer Muza identified himself as a probation officer and called Appellee by name, Appellee was compelled under his probation rules to stop and answer whatever brief questions Officer Muza might have; and Officer Muza needed no reasonable suspicion to support the contact or command Appellee to stop. According to the Commonwealth, all probationers must submit to any probation officer's requests at any time. The Commonwealth distinguished between a stop and a search, conceding a search of the probationer is unauthorized based solely on the fact that the probationer is currently under supervision. The Commonwealth submitted that, as soon as Appellee backed away from Officer Muza's command to stop, Appellee violated his probation rules, specifically Condition L (stating: "Follow the probation officers' instructions and advice"). The Commonwealth concluded Appellee's attempt to leave the scene gave Officer Muza reasonable suspicion to incapacitate Appellee with a Taser.

The court ultimately granted Appellee's motion to suppress on April 21, 2011. The court determined Officer Muza had "seized" Appellee when he told Appellee not to run, Officer Muza had no reasonable suspicion Appellee was engaged in criminal activity or in violation of his probation at that moment, so the seizure was therefore unlawful. The court further reasoned the illegal seizure warranted suppression of all evidence recovered during the resulting searches.

The Commonwealth timely filed notice of appeal on May 17, 2011. On May 18, 2011, the court ordered the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa. R.A.P. 1925(b), and the Commonwealth timely complied on June 2, 2011.

The Commonwealth raises two issues on appeal:

> WHETHER A PROBATION OFFICER NEEDS REASONABLE SUSPICION TO SPEAK WITH A PROBATIONER IN PUBLIC?
>
> CAN A PROBATION OFFICER DETAIN A PROBATIONER WHEN THE PROBATIONER FAILS TO SPEAK WITH HIM AND RUNS AWAY FROM HIM IN PUBLIC?

(Commonwealth's Brief at 4).[1]

▬▬ When the Commonwealth appeals from the grant of a suppression order, the relevant scope and standard of review are:

> [We] consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. As long as there is some evidence to support them, we are bound by the suppression court's findings of fact. Most importantly, we are not at liberty to reject a finding of fact which is based on credibility.

*Commonwealth v. Goldsborough*, 31 A.3d 299, 305 (Pa.Super.2011), appeal denied, —— Pa. ——, 49 A.3d 442 (2012) (internal citations omitted). "The suppression court's conclusions of law, however, are not binding on the appellate court, whose duty is to determine if the suppression court properly applied the law to the facts." *Id.* (quoting *Commonwealth v. Keller*, 823 A.2d 1004, 1008 (Pa.Super.2003), *appeal denied,* 574 Pa. 765, 832 A.2d 435 (2003)).

In its issues combined, the Commonwealth argues Appellee assented to a reasonable probation condition, by virtue of which any probation officer could speak with Appellee in public at any time and for any reason. Specifically, the Commonwealth relies on Condition L in Appellee's probation contract that states the probationer agrees to "follow the probation officers' advice and instruction." The Commonwealth maintains this provision allowed Officer Muza to stop Appellee at any time for questioning, to ensure compliance with his probation requirements; and the officers needed no reasonable suspicion or probable cause to do so. In other words, Condition L unequivocally gave Officers Muza and Kinsinger authority to instruct Appellee to stop and speak with them in public and answer questions.

Further, the Commonwealth contends probationers generally lose the protections of the reasonable suspicion standard for stops and seizures. The Commonwealth distinguishes between a seizure of a probationer and a search of a probationer. The Commonwealth reasons the appropriate standard for a search of a probationer is reasonable suspicion because probationers have a diminished expectation of privacy. Analogously, the Commonwealth claims the standard for seizure of a probationer drops from reasonable suspicion to no reason at all. The Commonwealth maintains Officer Muza could stop Appellee without reasonable suspicion because Appellee was already subject to supervision, by virtue of which Appellee had a diminished expectation of privacy.

Moreover, the Commonwealth justifies the stop by saying Appellee violated Condition L of his probation rules when he tried to leave after Officer Muza instructed him not to run. The Commonwealth insists Appellee's action gave the probation officers the authority to detain Appellee for the probation violation of failing to stop. Because the command not to run fell under Condition L, and Appellee's vio-

---

1. The Commonwealth certified, per Pa.R.A.P. 311(d), that the court's order terminated or substantially handicapped the prosecution of the case.

lation of Condition L legitimized the stop, the Commonwealth observes in a footnote (and without explanation) that the subsequent search was likewise sound; so any evidence discovered as a result qualified as either abandoned or lawfully obtained. The Commonwealth concludes the court erred in suppressing the evidence gained from the interaction of the probation officers with Appellee. We disagree.

 Probation is a form of authorized supervision "aimed at rehabilitating and reintegrating a law breaker into society as a law-abiding citizen … [and] is deemed a constructive alternative to imprisonment." *Commonwealth v. Colon,* 708 A.2d 1279, 1282 (Pa.Super.1998). One basic assumption of the institution of probation is that the probationer "is more likely than the ordinary citizen to violate the law." *Commonwealth v. Moore,* 805 A.2d 616, 619 (Pa.Super.2002) (quoting *United States v. Knights,* 534 U.S. 112, 120, 122 S.Ct. 587, 592, 151 L.Ed.2d 497, 501 (2001)). As a result, individuals under supervision generally have limited Fourth Amendment rights, but they are still entitled to certain constitutional protections. *Commonwealth v. Williams,* 547 Pa. 577, 586, 692 A.2d 1031, 1035 (1997). The Fourth Amendment constitutional rights of either a probationer or a parolee are virtually indistinguishable. *Id.* at 585 n. 7, 692 A.2d at 1035.

Back in 1993, our Supreme Court stated that absent "a statutory or regulatory framework [or] an agreement by the defendants consenting to a search":

> [T]he fourth amendment prohibits the warrantless search of probationer's or parolee's residences based upon reasonable suspicion without the consent of the owner or without a statutory or regulatory framework governing the search.

We do so because we recognize that there are no safeguards to protect the limited fourth amendment rights of probationers and parolees if their supervision is left entirely to the discretion of individual parole officers. In the traditional fourth amendment case, the warrant requirement based upon probable cause and issued by a neutral and detached magistrate guarantees the protection of a citizen's constitutional rights. Similarly, in the context of a probationer or parolee's limited fourth amendment rights, some systemic procedural safeguards must be in place to guarantee those limited fourth amendment rights.

*Commonwealth v. Pickron,* 535 Pa. 241, 246–47, 634 A.2d 1093, 1096 (1993) (internal citations and quotation marks omitted). In 1995, this Court explained:

> *Pickron* stands for the proposition that without a prior agreement, or specific guidance from statute or regulation, a [supervisee's] protection from an unreasonable search and seizure is no less than that afforded any other Commonwealth resident. It does not mean, however, that *Pickron* would extend to [supervisees] greater constitutional guarantees.

*Commonwealth v. Rosenfelt,* 443 Pa.Super. 616, 662 A.2d 1131, 1134 (1995), appeal denied, 544 Pa. 605, 674 A.2d 1070 (1996) (holding supervisee does not have diminished expectation of privacy, absent clear policy or agreement between supervisee and government body entrusted with supervision).

In October 2009, our state legislature made effective the following statute to govern the supervisory relationship between county probation officers and probationers and the concomitant rights of the probationers: [2]

---

2. Section 9912 is the relevant legislation here; 61 P.S. § 331.27b, effective January 16, 1996, was repealed in 2009.

## § 9912. Supervisory relationship to offenders

(a) **General rule.**—Officers are in a supervisory relationship with their offenders. The purpose of this supervision is to assist the offenders in their rehabilitation and reassimilation into the community and to protect the public.

(b) **Searches and seizures authorized.**—

(1) Officers and, where they are responsible for the supervision of county offenders, State parole agents may search the person and property of offenders in accordance with the provisions of this section.

(2)(i) Officers may search, in accordance with the provisions of this section, the person and property of any offender who accepts ARD as a result of a charge of a violation of 18 Pa.C.S. Ch. 31 (relating to sexual offenses) if the court has determined that the offender shall be subject to personal and property searches as a condition of the offender's participation in the ARD program.

(ii) The court shall notify each offender so offered ARD, prior to admission to an ARD program, that the offender shall be subject to searches in accordance with this section.

(iii) Nothing in this section shall be construed to permit searches or seizures in violation of the Constitution of the United States or section 8 of Article I of the Constitution of Pennsylvania.

(c) **Effect of violation.**—No violation of this section shall constitute an independent ground for suppression of evidence in any probation and parole or criminal proceeding.

(d) **Grounds for personal search.**—

(1) A personal search of an offender may be conducted by an officer:

(i) **if there is a reasonable suspicion** to believe that the offender possesses contraband or other evidence of violations of the conditions of supervision;

(ii) when an offender is transported or taken into custody; or

(iii) upon an offender entering or leaving the securing enclosure of a correctional institution, jail or detention facility.

(2) A property search may be conducted by an officer if there is reasonable suspicion to believe that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision.

(3) Prior approval of a supervisor shall be obtained for a property search absent exigent circumstances. No prior approval shall be required for a personal search.

(4) A written report of every property search conducted without prior approval shall be prepared by the officer who conducted the search and filed in the offender's case record. The exigent circumstances shall be stated in the report.

(5) The offender may be detained if he is present during a property search. If the offender is not present during a property search, the officer in charge of the search shall make a reasonable effort to provide the offender with notice of the search, including a list of the items seized, after the search is completed.

(6) The existence of reasonable suspicion to search shall be determined in accordance with constitutional search and seizure provisions as applied by

judicial decision. In accordance with such case law, the following factors, where applicable, may be taken into account:

(i) The observations of officers.

(ii) Information provided by others.

(iii) The activities of the offender.

(iv) Information provided by the offender.

(v) The experience of the officers with the offender.

(vi) The experience of officers in similar circumstances.

(vii) The prior criminal and supervisory history of the offender.

(viii) The need to verify compliance with the conditions of supervision.

(e) **Nonresident offenders.**—No officer shall conduct a personal or property search of an offender who is residing in a foreign state except for the limited purposes permitted under the Interstate Compact for the Supervision of Parolees and Probationers. The offender is held accountable to the rules of both the sending state and the receiving state. Any personal or property search of an offender residing in another state shall be conducted by an officer of the receiving state.

(f) **When authority is effective.**—The authority granted to the officers under this section shall be effective upon enactment of this section, without the necessity of any further regulation by the board.

42 Pa.C.S.A. § 9912 (some emphasis added). Essentially, Section 9912 authorizes county probation officers to search a probationer's person or property, if there is reasonable suspicion to believe the probationer possesses contraband or other evidence of violations of the conditions of supervision. 42 Pa.C.S.A. § 9912(d)(1)(i), (d)(2). Reasonable suspicion to search must be determined consistent with constitutional search and seizure provisions as applied by judicial decisions; and in accordance with such case law, enumerated factors, where applicable, may be taken into account. 42 Pa.C.S.A. § 9912(d)(6).

In light of this statute (and its predecessor), as well as legal precedent, the current rule in Pennsylvania continues to be that, absent an express agreement or legislative framework, a probationer is protected from unreasonable search and seizure in the same way as any other citizen. *Commonwealth v. Altadonna,* 817 A.2d 1145, 1149 (Pa.Super.2003) (holding generally that supervisee is not subject to diminished expectation of privacy regarding stop and search of supervisee's person; probation officer must have reasonable suspicion to seize and search probationer.). *See also Commonwealth v. Gayle,* 449 Pa.Super. 247, 673 A.2d 927, 932 (1996) (stating probationers do not have diminished expectation of privacy involving stops and seizures).

Under established Pennsylvania law, interactions between police and ordinary citizens fall within three general classifications:

The first [level of interaction] is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Bryant,* 866 A.2d 1143, 1146 (Pa.Super.2005), appeal denied, 583 Pa. 668, 876 A.2d 392 (2005).

Our Supreme Court has recognized that the line between a mere encounter and an investigative detention cannot be precisely defined because of the myriad of daily situations in which policemen and citizens confront each other on the street. Not all personal contacts or exchanges between police officers and individuals involve "seizures" of persons; however, not every police interrogation may be dismissed as personal intercourse. When an officer, by means of physical force **or show of authority,** has restrained the liberty of an individual, a "seizure" has occurred. Any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.

Our Supreme Court has adopted an objective test for determining whether a police officer has restrained the liberty of a citizen such that a seizure occurs. The pivotal inquiry in making this determination is whether a reasonable person innocent of any crime, would have thought he ... is being restrained had he ... been in the defendant's shoes. A Court must examine all surrounding circumstances evidencing a show of authority or exercise of force, including the demeanor of the police officer, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements. If a reasonable person would not feel free to terminate the encounter with police and leave the scene, then a seizure of that person has occurred.

*Commonwealth v. Key,* 789 A.2d 282, 288–89 (Pa.Super.2001), appeal denied, 569 Pa. 701, 805 A.2d 521 (2002) (emphasis added) (internal citations and quotation marks omitted) (holding interaction between defendant and police was more than "mere encounter" when police expressly informed defendant he was being "stopped"; Court

explicitly reasoned: "when an individual has been informed by a police officer that he ... has been 'stopped' the reasonable implication of such a statement to the individual is that his ... freedom of movement has been restrained by the officer").

 "An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate." *Commonwealth v. Jones,* 874 A.2d 108, 116 (Pa.Super.2005).

Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate.

*Id.* (Pa.Super.2005) (internal citations and quotation marks omitted). Reasonable suspicion for an investigative stop cannot rest on the mere presence of a probationer in a high crime area. *Gayle, supra.* Likewise, flight, in and of itself, does not constitute reasonable suspicion of criminal conduct to justify a stop. *Commonwealth v. McClease,* 750 A.2d 320, 326 (Pa.Super.2000) (quoting *Commonwealth v. DeWitt,* 530 Pa. 299, 308, 608 A.2d 1030, 1034 (1992)).

Instantly, Officers Muza and Kinsinger were driving in an area known for drug activity when by chance Appellee walked alone, in the opposite direction, past their vehicle. Officer Kinsinger recognized Appellee as a former probationer whom Officer Kinsinger had previously supervised and indicated that fact to Officer Muza. Officer Kinsinger also knew Appellee was currently on probation, although neither Officer Kinsinger nor Officer Muza was Appellee's present supervising probation officer. Officer Muza exited the vehicle, identified himself as a Dauphin County probation officer, and called out to Appellee by name. Appellee turned and gave Officer Muza a "deer in headlights" look. Appellee began to shift his feet and back away. Officer Muza immediately shouted at Appellee, "Do not run." Appellee shifted his feet, began to back away, and started to run. In response, Officer Muza withdrew his Taser and deployed it at Appellee.

The officers testified they wanted to question Appellee about his compliance with probation rules and conditions. They had not observed any suspicious behavior that evening. (*See* N.T. Suppression Hearing, 3/29/11, at 29, 38.) At the suppression hearing, Officer Kinsinger indicated his reasons for questioning Appellee were his recognition of Appellee and knowledge that Appellee was currently on probation. (*See id.* at 40.) Officer Muza testified that he saw Appellee walking in an area known for drug activity but observed no suspicious behavior from Appellee. (*Id.* at 18, 28–29.) The officers testified they did not even know who Appellee's current probation officer was, so they were unable to call Appellee's present supervisor to find out if Appellee was wanted for any violation of his probation. (*Id.* at 29, 42.)

The officers' testimony indicated no reasonable belief that Appellee had actually violated his probation. Neither officer described any specific conduct, either before they engaged Appellee or during their interaction, that led them to believe Appellee was involved in criminal activity. *See Jones, supra.* When Officer Muza identified himself as a probation officer and called out Appellee's name, the initial interaction with Appellee was a mere encounter, and Appellee was free to leave. *See Bryant, supra.* As soon as Officer Muza commanded Appellee not to run, the encounter became an investigative detention. When Officer Muza struck Appellee with the Taser to prevent Appellee's departure, Appellee was completely disabled; and Officer Muza had actually effectuated the functional equivalent of an arrest. Appellee's initial attempt to leave, by itself, did not give rise to reasonable suspicion. *See McClease, supra.* Therefore, the investigative detention of Appellee under these circumstances was unlawful.

Moreover, Condition L in Appellee's rules of probation did not extinguish Appellee's expectation of privacy. Condition L states that Appellee should "follow the probation officers' instructions and advice." Condition L contains generic language and references neither searches nor seizures. The language of the condition does not explicitly state or reasonably imply that Appellee expressly waived his Fourth Amendment rights or agreed to suspicionless stops. To construe the provision as broadly as the Commonwealth suggests would violate Section 9912 and wholly eliminate the expectation of privacy Appellee retained under his probation. In addition, if we construe Condition L as the Commonwealth submits, we would essentially tolerate any probation officer to stop any probationer, at any time, for any reason. Although probationers' constitutional rights are limited in certain respects, construing Condition L in this manner would upset the proper balance between en-

dorsed supervision and virtual oppression. *See Altadonna, supra* (standing for proposition that absent clear and express waiver or legislative framework, proper parole/probation supervision still requires reasonable suspicion, before lawful search and seizure, to protect constitutional rights of supervisee and to prevent pretextual stops).

Officer Muza's command of "do not run" was neither advice nor guidance. Even if Condition L required Appellee to follow Officer Muza's command, loosely interpreted as an "instruction," Officer Muza would still require reasonable suspicion to give that command because it constituted a seizure; and Appellee did not expressly waive his right against suspicionless seizures. Both officers indicated their impetus for stopping Appellee was to question him generally about compliance with his probation conditions, without any reason to believe Appellee had violated those conditions. Neither officer specified any questionable behavior to give them reasonable belief that Appellee had violated his probation or was involved in criminal activity. *See Jones, supra.* Officer Muza seized Appellee without reasonable suspicion the moment he told Appellee not to run. The unlawful seizure tainted the searches that followed. Thus, the record supports the court's decision to suppress the evidence.

Based on the foregoing, we hold the probation officers lacked the requisite reasonable suspicion to seize Appellee under the facts and circumstances of this case. Therefore, the court properly granted Appellee's suppression motion. Accordingly, we affirm.

Order affirmed.