J-A08022-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: COMMONWEALTH OF PENNSYLVANIA | : | |
| | : | |
| | : | |
| | : | No. 1996 EDA 2016 |

Appeal from the Order Entered June 10, 2016
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s):  CP-39-JV-0000216-2016

BEFORE:   PANELLA, J., LAZARUS, J., and STRASSBURGER*, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED MAY 04, 2018**

The Commonwealth of Pennsylvania (Commonwealth) appeals from the order,[1] entered in the Court of Common Pleas of Lehigh County, granting Appellee J.S.'s motion to suppress physical evidence and statements obtained as a result of an allegedly unlawful search and seizure.  After careful review, we affirm.

The suppression judge made the following findings of fact in the matter:[2]

---

[1] The Commonwealth has certified that the order will terminate or substantially handicap the prosecution.  **See** Commonwealth's Brief, at 8; **see also** Pa.R.A.P. 311(d).

[2] On September 26, 2017, this Court remanded the instant matter for preparation of a Pa.R.Crim.P. 581(I) record statement of findings of fact and conclusions of law from the suppression judge.  **See Commonwealth v. J.S.**, No. 1996 EDA 2016 (Pa. Super. filed Sept. 26, 2017).  The suppression judge complied with our directive and prepared a Pa.R.A.P. 1925(a) opinion detailing

---

\*   Retired Senior Judge assigned to the Superior Court.

- On March 21, 2016, Officer Jacoby Glenny, a City of Allentown police officer, was assigned the nightshift of the Fourth Platoon.

- At approximately 1:40 a.m., Officer Glenny pulled up to the traffic light at the intersection of Tenth and Turner Streets and observed a white Chevy Malibu in the parking lane at the corner of the intersection.

- While watching the vehicle, Officer Glenny further observed an individual drop a foil wrapper out of the driver-side car window onto the street.

- The vehicle had a dark-window tint, but Officer Glenny could see a person in the driver's seat of the vehicle.

- Officer Glenny continued driving as he ran the vehicle's registration. The registration did not match the white sedan. Officer Glenny drove around the block and parked on Tenth Street.

- Officer Glenny had mistakenly run the wrong registration. He ran the correct registration while parked on Tenth Street. Again, the registration did not match the vehicle.

- Officer Glenny turned his vehicle onto Turner Street and observed three males walking toward the white sedan. When the individuals saw the marked police vehicle and/or the uniformed officer, they turned around and began walking [in] the opposite direction.

- Officer Glenny notified the communications center that he was going to stop and talk to three males in the 900 block of Turner Street.

- Two additional officers responded that they were *en route*. The males began to walk through the park located in the 900 block of Turner Street.

---

his findings of fact and conclusions of law in the matter. **See** Trial Court Opinion, 1/30/18.

- The park was closed at that hour.  Officer Glenny called to the three males; he told them to stop and to come toward him so he could talk to them.

- The males continued to walk south into the park. Officer Glenny followed them.

- The park was dark with no street lights.

- The individuals each separately complied with the officer's requests for them to stop.  J.S. was the last person to stop and walk toward the officer.

- Officer Glenny spoke to the three males for approximately one to two minutes.

- J.S. was asked and he confirmed that he was the driver of the white sedan, it was his vehicle, and that he had recently purchased it.

- J.S. was not asked to provide his name, date of birth, address, or to show identification.

- J.S. approached Officer Glenny with his hands in his pockets.  Officer Glenny asked J.S. to remove his hands from his pockets; J.S. complied.  However, J.S. subsequently put his hands back in his pockets while talking to Officer Glenny.  Officer Glenny repeated his request for J.S. to remove his hands from his pockets; J.S. again complied.

- J.S. was cooperative[,] but standoffish with Officer Glenny.

- J.S. stood approximately five feet away from Officer Glenny.

- After a few minutes of questioning, Officer Glenny asked J.S. to come closer.  Instead, J.S. took a step away from Officer Glenny.  The officer reached out to grab J.S.'s arm, but J.S. ducked away from Officer Glenny, put his hands down at his waist, and ran west through the park.

- J.S. ran for approximately 100 feet. He was chased by Officer Glenny who deployed his Taser.  J .S. was hit by the Taser and collapsed face-first in the middle of Hazel Street. He was bleeding from his face, nose, and mouth.

- J.S. was put in handcuffs.

- A firearm was recovered from J.S.'s waistband, along with five live rounds and an extended magazine. Nine bags of marijuana were found in his shorts.

Trial Court Opinion, 1/30/18, at 1-3 (citations to notes of testimony omitted).

On April 8, 2016, the Commonwealth filed a juvenile petition charging J.S. with firearms not to be carried without a license,[3] possession of a firearm with altered manufacturer's number,[4] possession of a small amount of marijuana,[5] and disorderly conduct.[6] On May 2, 2016, J.S. filed a pre-trial motion to suppress physical evidence and/or statements. After a hearing, the court granted J.S.'s motion to suppress. This timely appeal follows.

On appeal, the Commonwealth presents the following issue for our review: "Did the trial court err in concluding that police unlawfully searched and seized [J.S.], where [J.S.] was stopped based on probable cause that he had violated various ordinances, the Crimes Code, and the Vehicle Code, and the police gathered reasonable suspicion [J.S.] was armed[?]" Commonwealth's Brief, at 4.

An appellate court's standard of review in suppression matters is well-settled:

> When the Commonwealth appeals from a suppression order, an appellate court follows a clearly defined standard of review and considers only the evidence from the defendant's witnesses

---

[3] 18 Pa.C.S. § 6106(a)(1).

[4] 18 Pa.C.S. § 6110.2(a).

[5] 35 P.S. § 780-113(a)(31).

[6] 18 Pa.C.S. § 5503(a)(4).

together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

***Commonwealth v. Carter***, 105 A.3d 765, 768 (Pa. Super 2014) (citations omitted).

Instantly, the Commonwealth asserts that the police had probable cause to stop J.S. where he had "violated various ordinances, the Crimes Code and the Vehicle Code, and the[y] had gathered reasonable suspicion that [J.S.] was armed." Commonwealth's Brief, at 4.

Under Pennsylvania law, there are three levels of encounters that aid courts in conducting search and seizure analyses.

The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

\* \* \*

When an officer, by means of physical force or show of authority, has restrained the liberty of an individual, a "seizure" has occurred. Any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.

Our Supreme Court has adopted an objective test for determining whether a police officer has restrained the liberty of a citizen such that a seizure occurs. The pivotal inquiry in making this determination is whether a reasonable person innocent of any

crime, would have thought he . . . [wa]s being restrained had he . . . been in the defendant's shoes. A Court must examine all surrounding circumstances evidencing a show of authority or exercise of force, including the demeanor of the police officer, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements. If a reasonable person would not feel free to terminate the encounter with police and leave the scene, then a seizure of that person has occurred.

*Commonwealth v. Chambers*, 55 A.3d 1208, 1214-15 (Pa. Super. 2012) (citations and headnote omitted).

Instantly, Officer Glenny was driving in a marked police cruiser, at 1:30 a.m., in an area known for drug activity. He observed an occupant of a parked vehicle toss a foil wrapper out onto the street; he testified that the cigars inside such wrappers are used to smoke marijuana. *Id.* at 9. The officer ran the car's registration in the PennDot database; the state records indicated that the car associated with the registration was not the same as the parked vehicle. The car, however, was not designated as stolen. *Id.* at 39. Officer Glenny then observed three individuals walking toward the vehicle. When they noticed the officer, they turned around and walked into a nearby, closed park. At that point, Officer Glenny effectuated an encounter, asked the three individuals to stop, and initiated a conversation with them. J.S. acknowledged that he owned the parked car and that he had recently purchased it. *Id.* at 8. Although the registration did not match the car on the system, Officer Glenny never asked J.S. for any identification, proof of vehicle ownership, or insurance or registration information. *Id.* at 32, 40.

During his interaction with Officer Glenny, J.S. kept his hands in his pockets. Officer Glenny asked J.S. to remove his hand from his pockets; he complied. However, J.S. put his hands back in his pockets again; when asked to remove them a second time, J.S. again complied. Minutes later, back-up officers arrived on the scene and saw Officer Glenny talking to the three males. Just as Officer Glenny asked J.S. to "come here," J.S. took a step back away from him. *Id.* at 39. At that point, the officer "reached out to grab ahold of [J.S.'s] arm;" J.S. immediately took his hands towards his waist, ducked away from Officer Glenny, and turned and ran. *Id.* J.S. ran for approximately 100 feet, chased by Officer Glenny, and was hit with the officer's Taser. J.S., who was now bleeding from his face, nose, and mouth, was put in handcuffs. A search incident to his arrest uncovered a firearm, live rounds, an extended magazine, and nine bags of marijuana on J.S.'s person.

Based on the evidence, Officer Glenny was effectuating a mere encounter when he approached J.S. and his two compatriots as they were walking toward the car. He had neither reasonable suspicion nor probable cause at that point. *Chambers*, *supra*. However, when J.S. walked away from the officer and entered a park after closing, potentially violating a city ordinance prohibiting persons from being in a closed park, the officer was justified in detaining J.S. for questioning. *Cf. See In the Interest of J.G.*, 860 A.2d 185 (Pa. Super. 2004) (officers do not have reasonable suspicion of criminal activity "where the only evidence of criminal wrongdoing was [a juvenile]'s presence in a high[-]crime area combined with his decision to 'walk

away' from the police officers upon seeing their approach."); ***Commonwealth v. DeWitt***, 608 A.2d 1030, 1034 (Pa. 2000) (flight, in and of itself, does not constitute reasonable suspicion of criminal conduct to justify stop). Moreover, once J.S. admitted he owned the car, Officer Glenny had further reasonable suspicion to stop the three men and investigate further.

Our Court has held that:

[t]he allowable scope of an investigative detention by police differs with every set of facts. ***See Commonwealth v. Dangle***, 700 A.2d 538, 540 (Pa. Super. 1997)[.] This Court has further stated that the scope of an investigative detention "[t]ypically means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." ***Commonwealth v. Douglass***, [] 539 A.2d 412, 420 (Pa. Super. 1988)[.] However, the United States Supreme Court defined the permissible scope of an investigative detention when it stated:

An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

***Commonwealth v. Stevenson***, 832 A.2d 1123, 1130 (Pa. Super. 2003), citing ***Florida v. Royer***, 460 U.S. 491, 500 (1983) (internal citations omitted) (emphasis added).

While Officer Glenny initially had reasonable suspicion to stop and investigate the situation, after talking with J.S. for a few minutes, he failed to obtain further information to confirm or dispel his suspicions regarding the

park violation and also never asked J.S. for any identification, proof of vehicle ownership, or insurance or registration information on the white Chevy Malibu. Moreover, Officer Glenny did not uncover any additional facts that would reasonably lead him to believe that a crime was being or had been committed. Finally, the officer failed to issue any city ordinance citation, or criminal code or vehicle code violations during the duration of the stop. Under these circumstances, the Commonwealth did not demonstrate that the detention "lasted no longer than what was necessary to effectuate the purpose of the stop." **Stevenson**, **supra**.

The Commonwealth contends that "[b]ased on J.S.'s mannerisms, repeated refusal to respond to the officer's requests and furtiveness, Officer Glenny acted reasonably in reaching to stop J.S.'s hands from returning to his waistband area and pockets, and then chasing him as he fled." Commonwealth's Brief, at 18. Specifically, the Commonwealth claims that at the point Officer Glenny reached for J.S.'s arm, he was, in effect, conducting a **Terry**[7] frisk, a limited search for weapons believing that J.S. may be armed or that his own safety was in jeopardy. We disagree.

Under **Terry**, if the police reasonably believe that a suspect legally detained may be armed and dangerous, then they are permitted to conduct a limited pat-down search of the suspect's outer clothing for weapons to ensure their safety. **In the Interest of J.V.**, 762 A.2d 376 (Pa. Super. 2000).

---

[7] **Terry v. Ohio**, 392 U.S. 1 (1968).

However, in order to assess whether an officer has a reasonable belief, "consideration is given to specific reasonable inferences which the officer can draw from the facts in light of his experience." *Id.* at 380. No consideration is given, however, to an officer's unparticularized suspicions or hunches. *Id.*

Instantly, Officer Glenny never testified at the suppression hearing that he believed J.S. was potentially armed and dangerous or that he feared for his safety during the encounter. In fact, the officer testified that J.G. was cooperative, compliant, and did not display signs of nervousness, intoxication or being under the influence of drugs. N.T. Suppression Hearing, 5/4/16, at 9-12. Accordingly, we do not find Officer Glenny had the right to conduct a frisk or pat-down of J.S. where he did not have a reasonable belief that J.S. might be armed and dangerous. *Terry*, *supra*.

Officer Glenny testified that he reached for J.S.'s arm because J.S.: kept putting his hands in and out of his pockets after being requested to remove them; seemed "standoffish;" and took a step back from the officer when he asked him to "come here." *Id.* at 11. At the point Officer Glenny reached out to grab J.S.'s arm, J.S. was, in effect, the subject of a custodial interrogation, which must be supported by probable cause. *See Commonwealth v. Ingram*, 814 A.2d 264, 270 (Pa. Super. 2002), quoting *Commonwealth v. Gonzalez*, 546 A.2d 26, 29 (Pa. 1988), (the "test for custodial interrogation is 'whether the suspect . . . reasonably believes his freedom of action or movement is being restricted[.]'"). Officer Glenny testified that right before he reached out to grab J.S.'s arm, he believed J.S. had committed only

summary offenses (littering, registration problem and walking through a closed park). *Id.* at 40. Under such circumstances, we do not find that Officer Glenny had probable cause.

In addition, when Officer Glenny struck J.S. with the Taser as he ran from him, he effectuated the functional equivalent of an arrest. **Chambers**, 55 A.3d at 1217; **Ingram**, **supra**. However, J.S.'s attempt to abscond, by itself, did not give rise to probable cause. **DeWitt**, **supra**. Under such circumstances, the unlawful arrest tainted any search that followed. Therefore, the trial court properly granted J.S.'s motion to suppress any and all statements and physical evidence recovered as a result of Officer Glenny's stop of J.S.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/4/18