J-A15019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: R.D., A MINOR | : | |
| | : | |
| | : | No. 1749 MDA 2024 |

Appeal from the Dispositional Order Entered October 29, 2024
In the Court of Common Pleas of Dauphin County Juvenile Division at
No(s): CP-22-JV-0000445-2024

BEFORE: BOWES, J., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.: **FILED: DECEMBER 31, 2025**

R.D. appeals from the dispositional order following his adjudication of delinquency for acts that would constitute the crimes of carrying a firearm without a license, possession with intent to deliver, possession of a firearm by a minor, and possession of drug paraphernalia. On appeal, he challenges the denial of his motion to suppress. We affirm.

The juvenile court provided the following summary of the underlying facts:

> On June 7, 2024, Probation Officer Daniel Kinsinger [("APO Kinsinger")], working with Dauphin County Probation Services' Harrisburg Street Crimes Unit ("SCU"), was riding in the front passenger's seat of an unmarked police car driven by Corporal Jeremy Crist [("Corporal Crist")] of the Harrisburg City Police Department. [APO] Kinsinger and Corporal Crist were working in the area of 6th and Woodbine Streets, an area of Harrisburg with

---

[*] Former Justice specially assigned to the Superior Court.

a history of narcotics arrests, firearms arrests, homicides, and assaults.

At around 3:00 p.m., [APO] Kinsinger and Corporal Crist were traveling eastbound in the 500-block of Woodbine Street when [APO] Kinsinger recognized Appellant walking eastbound towards the corner of 6th and Woodbine Streets. [On this warm day, Appellant was wearing shorts, sandals, and a hooded sweatshirt. APO] Kinsinger knew at the time that Appellant was on juvenile probation supervision, and based on conversations with other members of the SCU, [APO] Kinsinger was aware that from March to April of 2024, there had been several calls of service involving Appellant. The first call of service, which occurred in late March, involved an incident where Appellant was the victim of a robbery in an alley close to the area of 6th and Woodbine Streets. In that incident, Appellant was found to be in the possession of a firearm. [APO] Kinsinger also recalled a second call of service, occurring only several days after the previous one, in which Appellant was found to be in possession of a large knife.

Based on the foregoing, [APO] Kinsinger elected to make contact with Appellant and asked Corporal Crist to let him out of the police vehicle. As Appellant was still walking eastbound on Woodbine Street, [APO] Kinsinger got out of the police car, stood on the north side of the sidewalk about [fifteen] or [twenty] feet from Appellant, and called out to Appellant by his first name. Appellant turned around and looked at [APO] Kinsinger but continued to walk eastbound. [APO] Kinsinger then called out Appellant's name a second time. Appellant again turned around and looked at [APO] Kinsinger but continued walking eastbound. [APO] Kinsinger was wearing gear clearly identifying him as a parole officer,[1] so he began to become suspicious as to why Appellant was ignoring him and walking away from him. [APO] Kinsinger then jogged up to Appellant and grabbed ahold of Appellant's right arm.

Once [APO] Kinsinger had ahold of Appellant's right arm, he began asking him why he did not stop and explained to Appellant that he was a parole officer stopping to make contact with him on

---

[1] Although the video confirms that his uniform said "parole," APO Kinsinger testified that he was a probation officer. *See* N.T. Suppression, 9/12/24, at 5-6.

the street. Appellant looked at [APO] Kinsinger with a confused stare. While they were conversing, Appellant stuck his left hand into his left pants pocket. [APO] Kinsinger then asked Appellant to keep his hands out of his pockets, but Appellant proceeded to place his hand into his pocket a second time, which raised another red flag for [APO] Kinsinger. As they kept talking, [APO] Kinsinger observed that Appellant's hands and legs were shaking and that Appellant was visibly nervous. Based on these observations, [APO] Kinsinger asked Appellant if he had anything illegal on him. In response, Appellant asked "why." [APO] Kinsinger repeated his question, and again, Appellant replied by asking "why." At this time, [APO] Kinsinger was under the impression that Appellant was going to have some form of illegal contraband on his person, and [he] placed Appellant's right hand behind his back.

Observing what was transpiring, Corporal Crist, who had parked his car up the block, arrived on the scene and assisted [APO] Kinsinger in handcuffing Appellant. [APO] Kinsinger then lifted the front of Appellant's hooded sweatshirt and revealed a Smith & Wesson 9-millimeter handgun in Appellant's waistband. [APO] Kinsinger removed the firearm, took a magazine out of it, and ejected a round from the firearm's chamber. [APO] Kinsinger then placed the firearm into Corporal Crist's unmarked police vehicle and turned the matter over to Corporal Crist, as it had turned into a criminal investigation.

Knowing that Appellant was only [seventeen] years of age and that he was not old enough to carry the firearm he was carrying, Corporal Crist advised Appellant he was under arrest and began a search of Appellant's person. The search uncovered a digital scale in Appellant's right shorts pocket and a bag of crack cocaine in his left pants pocket. Lab testing by the Pennsylvania State Police established that the cocaine amounted to 7.7 grams, which, according to Corporal Crist, is a significant amount of crack and is more than one would typically carry around for personal use.

Juvenile Court Opinion, 1/24/25, at 2-5 (cleaned up).

In light of the foregoing, the Commonwealth filed a petition for delinquency. Appellant moved to suppress the physical evidence based upon an allegation that APO Kinsinger lacked reasonable suspicion to subject

Appellant to an investigative detention. After hearing testimony from APO Kinsinger and Corporal Crist, watching Corporal Crist's bodycam footage,[2] and considering the arguments of counsel, the court denied Appellant's motion to suppress. Appellant filed a motion for reconsideration, which the court denied at the beginning of the delinquency hearing. The court adjudicated Appellant delinquent of all charges, and at an October 29, 2024 dispositional hearing, ordered him to serve probation.

This timely appeal followed.[3] The juvenile court ordered a Pa.R.A.P. 1925(b) statement, which Appellant timely filed.[4] The court authored a responsive Rule 1925(a) opinion. Appellant presents the following issues for our consideration:

> I. Whether the [juvenile] court erred when it entered an order on September 12, 2024, denying suppression of physical evidence of a loaded 9mm handgun; 7.7 grams of crack cocaine; and a digital scale. Specifically:
>
> > a. Whether APO Kinsinger lacked the requisite reasonable

---

[2] This Court reviewed the video footage. Since Corporal Crist let APO Kinsinger out of the vehicle to approach Appellant while the corporal parked, the beginning of the video only captured the interior of the vehicle. The first relevant portion of the encounter that the body-worn camera recorded is after APO Kinsinger had already grabbed Appellant's arm.

[3] Since the thirtieth day following the order of disposition fell on Thanksgiving, Appellant's notice of appeal, submitted on the thirty-first day, was timely. *See* 1 Pa.C.S. § 1908 ("Whenever the last day of any such period shall fall on . . . any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation.").

[4] We remind the juvenile court that it must provide "the address to which the appellant can mail the Statement." Pa.R.A.P. 1925(b)(3)(iii).

suspicion when he conducted an illegal investigative stop (**Terry**[5] stop)?

b. Whether APO Kinsinger lacked the requisite reasonable suspicion when he conducted an illegal warrantless seizure, which occurred the moment he grabbed [Appellant]'s right arm?

c. Whether APO Kinsinger lacked the requisite reasonable suspicion when he conducted an illegal warrantless search of [Appellant], the moment he lifted up [Appellant]'s sweatshirt and touched [Appellant]'s waist, which revealed a firearm concealed in [Appellant]'s waistband?

Appellant's brief at 3 (cleaned up).

In his first two issues, Appellant challenges the court's denial of his motion to suppress based upon an allegation that APO Kinsinger lacked the requisite suspicion to initiate an investigatory detention. As such, we conduct our review pursuant to the following legal principles:

An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

_____

[5] **Terry v. Ohio**, 392 U.S. 1 (1968).

- 5 -

The reviewing court's scope of review is limited to the record evidence from the suppression hearing.

*Commonwealth v. Brinkley*, 331 A.3d 85, 90–91 (Pa.Super. 2025) (cleaned up).

As a starting point, our analysis of suppression issues depends upon which of the three levels of police interaction is at play:

The first, a mere encounter, does not require any level of suspicion or carry any official compulsion to stop or respond. The second, an investigative detention, permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause.

*Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (cleaned up). We agree with Appellant's assessment that APO Kinsinger subjected Appellant to an investigative detention when he grabbed Appellant's arm. *See* Appellant's brief at 22; *Commonwealth v. Cost*, 224 A.3d 641, 650 (Pa. 2020) ("[T]he 'free-to-leave' standard presents the central inquiry of whether, considering the totality of the circumstances, the relevant police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." (cleaned up)).

Thus, to resolve Appellant's issues on appeal, we must determine whether APO Kinsinger had the requisite level of suspicion to support that intrusion. In this regard, our Supreme Court has instructed as follows:

Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.

Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Rice*, 304 A.3d 1255, 1261 (Pa. 2023) (cleaned up).

Further,

[i]n making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

Behavior indicative of the presence of a firearm contributes to the totality of the circumstances in determining whether there is reasonable suspicion to investigate further. *Commonwealth v. Hicks*, 208 A.3d 916 (Pa. 2019).

*Id*. (some citations and ellipses omitted, citation altered).

Appellant argues that the officers' subjective awareness of the prior service calls relating to Appellant should not have been part of the totality of the circumstances in determining whether reasonable suspicion supported the investigative detention. *See* Appellant's brief at 18-21. However, we cannot ignore that Appellant, a minor on probation, was stopped by a probation officer. APO Kinsinger had statutory authority to both stop and search Appellant "[i]f there [wa]s a reasonable suspicion to believe that the child

possesse[d] contraband or other evidence of violations of the conditions of supervision." 42 Pa.C.S. § 6304(a.1)(4)(i)(A). Section 6304 explains:

> (vi) The existence of reasonable suspicion to search shall be determined in accordance with constitutional search and seizure provisions as applied by judicial decision. In accordance with that case law, the following factors, where applicable, may be taken into account:
>
> > (A) The observations of officers.
> >
> > (B) Information provided by others.
> >
> > (C) The activities of the child.
> >
> > (D) Information provided by the child.
> >
> > (E) The experience of the probation officer with the child.
> >
> > (F) The experience of probation officers in similar circumstances.
> >
> > (G) The prior delinquent and supervisory history of the offender.
> >
> > (H) The need to verify compliance with the conditions of supervision.

42 Pa.C.S. § 6304(a.1)(4)(vi). Therefore, APO Kinsinger's awareness of those prior calls for service, which involved Appellant's possession of weapons, were appropriately considered as part of the totality of the circumstances.

Appellant next argues that merely being in a high crime area is insufficient to instill reasonable suspicion of criminal activity, especially as he resided approximately one block away and, as a minor, cannot control where he lives. *See* Appellant's brief at 18. Additionally, he analogizes the facts of

- 8 -

the instant case to those in **Commonwealth v. Chambers**, 55 A.3d 1208 (Pa.Super. 2012). **Id**. at 19-21.

We address these contentions *seriatim*. First, this Court and our Supreme Court have oft noted the salient words of the late Eugene B. Strassburger, III, that "[p]eople who live in poor areas that are riddled with crime do not have fewer constitutional rights than people who have the means to live in 'nice' neighborhoods." **Commonwealth v. Lewis**, 343 A.3d 1016, 1052 (Pa. 2025) (Wecht, J., concurring) (quoting **Commonwealth v. Barr**, 240 A.3d 1263, 1291 (Pa.Super. 2020) (Strassburger, J., concurring), *rev'd on other grounds*, 266 A.3d 25 (Pa. 2021)). Nonetheless, the law remains that "if the suppression court is satisfied the Commonwealth has introduced sufficient credible evidence implicating the area is high in crime, the court must then determine in its sole discretion what weight to assign to this factor." **Lewis**, 343 A.3d at 1036 (cleaned up). In other words, presence in a high crime area is a factor that may be properly considered in conjunction with other factors. It was up to the juvenile court to determine the weight to be accorded to Appellant's presence on that particular corner. That Appellant lived in the neighborhood did not prevent the court from also assessing, based upon the testimony, the relevance of Appellant's presence there. Phrased differently, the fact that he lived in a high crime area impacted not the propriety of the court's consideration of his presence there, but the weight to ascribe to it.

Finally, we deem the totality of the circumstances in the matter *sub judice* to be materially distinguishable from those in **Chambers**. In that case, we concluded that an investigative detention of a probationer was improper when premised solely upon his flight from the officer's presence in a high-crime area. **Chambers**, 55 A.3d at 1216 ("[Chambers's] initial attempt to leave, by itself, did not give rise to reasonable suspicion."). Of paramount importance, the officers in **Chambers** did not "specif[y] any questionable behavior to give them reasonable belief that [Chambers] had violated his probation or was involved in criminal activity." *Id*. at 1217 (cleaned up).

Here, as explained by the juvenile court, APO Kinsinger observed Appellant walking in a high-crime area "towards a specific street corner known for heavy drug activity." Juvenile Court Opinion, 1/24/25, at 6. It continued:

> APO Kinsinger knew that Appellant was on juvenile probation supervision and knew that only a few months earlier, there had been several calls of services involving Appellant, including one where Appellant was found to be in the possession of a firearm on the same street corner he was presently heading towards, and another incident in which Appellant was found to be in the possession of a large knife.

*Id*. Appellant turned around to look at APO Kinsinger twice after he called out Appellant's name, but ignored the officer, who was wearing clothing that clearly identified him as an officer, and instead kept walking away. *Id*. at 7. Moreover, the officers observed the incongruity of the warm June weather and Appellant wearing shorts and sandals, with him also donning a hooded

- 10 -

sweatshirt that, in the officers' experience, suggested an intent to conceal something.[6]  *See* N.T. Suppression, 9/12/24, at 30-31.

Our review of the record confirms the court's factual findings.  Given the totality of the circumstances, we discern no error in the court's conclusion that APO Kinsinger had reasonable suspicion to initiate the investigative detention.  Thus, Appellant is not entitled to relief on his first two claims.

In his last issue, Appellant argues that APO Kinsinger lacked reasonable suspicion to search Appellant's person at the time he lifted his sweatshirt.  *See* Appellant's brief at 26.  It is well-settled that "to proceed from a stop to a frisk, the police officer must reasonably suspect that the person is armed and dangerous."  *Int. of T.W.*, 261 A.3d 409, 417 (Pa. 2021) (cleaned up).  Furthermore, as detailed hereinabove, a probation officer may search a juvenile probationer "[i]f there is a reasonable suspicion to believe that the child possesses contraband or other evidence of violations of the conditions of supervision."  42 Pa.C.S. § 6304(a.1)(4)(i)(A).

Here, the juvenile court found that the totality of the circumstances immediately preceding the lifting of Appellant's sweatshirt provided APO Kinsinger with reasonable suspicion that Appellant was armed and dangerous:

> Appellant was walking towards an area known for high drug activity, and it is commonplace for those engaging in drug activity to carry weapons on their person.  Moreover, as APO Kinsinger

---

[6] While the corporal acknowledged on cross-examination that he "see[s] a lot more people wearing sweatshirts[,]" the court was permitted to credit his testimony that "[u]sually people wear hooded sweatshirts at that time of year . . . to . . . conceal something."  N.T. Suppression, 9/12/24, at 30-31, 33.

was speaking with Appellant during his investigative stop, Appellant presented very nervously, repeatedly placed his hand into his pockets despite [APO] Kinsinger's repeated commands for him not to do so, and repeatedly evaded [APO] Kinsinger's questions about whether he had anything illegal on his person. Finally, it was known to [APO] Kinsinger that in a previous incident, Appellant had been found to be in possession of a large knife, and in a second prior incident, Appellant was found to be in possession of a firearm on the exact street corner he was presently walking towards.

Juvenile Court Opinion, 1/24/25, at 8-9.

Appellant acknowledges that the search was permissible if supported by reasonable suspicion that he was either armed and dangerous, or, as a probationer, in possession of contraband or evidence of a probation violation. *See* Appellant's brief at 27-28. However, he maintains that the officers lacked such suspicion. In support of reversal, Appellant raises many of the same arguments as his first two claims, highlighting that he "was merely a pedestrian" walking on the street where he lived with his family. *Id*. at 28-29. Additionally, he posits that "[c]oncealing a firearm alone is an insufficient basis for reasonable suspicion that criminal activity is afoot." *Id*. at 27 (citing *Hicks*, 208 A.3d at 945). Appellant further notes that the nervousness came into play only after the arm grab, which he insists was illegal. *Id*. at 32. Finally, he contests the officer's testimony that his hand was going into his pocket because "the body camera footage reveals that Appellant is actually holding a cell phone in that hand the entire time up until APO Kinsinger and [Corporal] Crist placed Appellant in handcuffs." *Id*. at 31-32.

Preliminarily, we already detailed in our prior analysis that the investigative detention was properly supported by reasonable suspicion. Therefore, the juvenile court appropriately considered the actions preceding and following that stop in assessing reasonable suspicion for the search. To recap, Appellant was in a high-crime area, had prior calls for service related to weapon possession in that same area, he was evasive when approached by APO Kinsinger, and his clothing did not match the weather and could be used to hide a weapon.

Regarding what occurred after the arm grab, our review of the video evidence does not compel us to reach the same conclusion as Appellant with respect to his hand movements. Corporal Crist is not present for the beginning of the encounter, and therefore there are portions of the interaction that we simply do not see because he is still parking the vehicle. Once he approaches the scene, Appellant's left hand is generally either outside the frame or covered by his body and/or that of APO Kinsinger. Moreover, even if Appellant had a phone in his hand, we fail to see how that prevented him from taking actions that demonstrated an intent to access his pocket when asked not to do so. Certainly, it would have taken mere seconds to place his hand in a pocket and swap the phone out for a weapon. Accordingly, we are not persuaded by this argument.

Finally, we readily dispose of Appellant's reliance on **Hicks**. As set forth in the law governing the prior two claims, suspected possession of a firearm may still contribute as a factor; it just cannot be the sole factor giving rise to

reasonable suspicion. ***See Hicks***, 208 A.3d at 945 (holding that possession of a firearm "alone is an insufficient basis for reasonable suspicion that criminal activity is afoot").

More critically, though, the concerns that informed the High Court's decision in ***Hicks*** simply are not present here. An **adult** may lawfully possess and/or conceal a firearm. Contrarily, it is inherently illegal for a **minor** to possess or conceal one. ***See*** 18 Pa.C.S. 6110.1 ("[A] person under [eighteen] years of age shall not possess . . . a firearm anywhere in this Commonwealth."); ***In re R.B.G.***, 932 A.2d 166, 170-71 (Pa.Super. 2007) (holding that juveniles may be adjudicated delinquent of 18 Pa.C.S. § 6106, despite their ineligibility to obtain a license due to age, because the General Assembly did not exempt from prosecution those, such as juveniles, who are "absolutely disqualified from obtaining a license"). Hence, APO Kinsinger had an articulable suspicion that he was hiding a firearm in his sweatshirt, and that was a proper consideration in assessing the presence of reasonable suspicion.

Our review of the certified record confirms the court's findings of fact. Taking into consideration the totality of the circumstances, we discern no error in the court's conclusion that APO Kinsinger had reasonable suspicion to search Appellant for weapons. Thus, he is not entitled to relief on his third claim.

Based on the foregoing, we affirm the order of the juvenile court.

Order affirmed.

- 14 -

P.J.E. Stevens joins this Memorandum.

Judge Stabile files a Dissenting Memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/31/2025